**COLONIAL SURETY CO., Plaintiff,**

v.

**The UNITED STATES, Defendant and Third–party Plaintiff,**

v.

**DME Construction Associates, Third–party Defendant.**

**No. 10–820 C**

United States Court of Federal Claims.

Filed: January 14, 2013

See also 2011 WL 703601, 2011 WL 4592569.

Larry L. Miller, Duncannon, PA, for plaintiff.

Sarah M. Bienkowski, Trial Attorney, with whom were Steven J. Gillingham, Assistant Director, Jeanne E. Davidson, Director, and Stuart F. Delery, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Ellen M. Evans, Senior Trial Attorney, Naval Litigation Office, Washington, DC, of counsel.

Cross–Motions for Summary Judgment; Duties of the Government as Stakeholder; Equitable Subrogation; Breach of Contract

## OPINION

HEWITT, Chief Judge

Colonial Surety Company (Colonial or plaintiff) was the surety for DME Construction Associates (DME or third-party defendant) on a construction contract for roof replacement with the Department of the Navy (the Navy, defendant or the government) at the Naval Support Activity in Mechanicsburg, Pennsylvania. *See* Am, Compl., Docket Number (Dkt. No.) 11, ¶ 1.[1] As a condition

---

1. When citing to the Amended Complaint, Docket Number (Dkt. No.) 11, the court cites to the numbered paragraph(s) or, for material not in numbered paragraphs, to the page number(s). When citing to the exhibits that are attached to the Amended Complaint, Dkt. No. 11–1, the

of the contract, and in accordance with section 3 13 1(b) of the Miller Act, codified as amended at 40 U.S.C. §§ 3131–3134 (2006), DME secured payment and performance bonds from Colonial,[2] see Am, Compl. Ex. A (Miller Act bonds) 2–3. Colonial now seeks to recover from the government on a motion for partial summary judgment a payment of $249,743.78 that, plaintiff contends, was wrongfully made by the Navy to DME. Am. Compl. ¶¶ 26, 32–33.

Before the court are plaintiff's Amended Complaint,[3] filed April 26, 2011; Colonial Surety Company's Notice of Motion … for Partial Summary Judgment, Dkt. No. 45–2, and Brief of Colonial Surety Company in Support of Its Motion for Partial Summary Judgment (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 45–4,[4] filed July 24, 2012; Defendant's Response to Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross–Motion for Summary Judgment (defendant's Motion or Def.'s Mot.), Dkt. No. 46,[5] attached to which is defendant's Appendix (Def.'s App.), Dkt. Nos. 46–2, 46–3, filed August 24, 2012; the Reply Brief of Colonial

court cites to the exhibit letter provided by plaintiff followed by the page number assigned by the court's electronic case filing system that appears at the top of the referenced page.

2. Under the Miller Act, as a prerequisite to being awarded a contract of "more than $100,000 for the construction, alteration, or repair of any public building or public work of the Federal Government," a contractor must post both a performance bond and a payment bond, which become binding on the winning contractor when the contract is awarded. *See* 40 U.S.C. § 3131(b) (2006). "A performance bond protects the Government, as the surety guarantees performance of the contract and completion of the project in the event of contractor default, whereas a payment bond protects all persons supplying labor and material, if the contractor ceases to pay." *United Sur. & Indem. Co. v. United States*, 87 Fed.Cl. 580, 591 (2009).

3. Plaintiff's Complaint was transferred to this court by the Middle District of Pennsylvania (District Court) on November 30, 2010. Dkt. No. 1. On May 21, 2009 Colonial filed a complaint in the District Court (District Court complaint) against DME Construction Associates (DME) and its owners, Darlene Edwards and Peter Chardon, seeking recovery for losses associated with the roof replacement contract at issue in this case and two unrelated projects. App. to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. & Def.'s Cross–Mot. for Summ. J. (Def.'s App.), Dkt. Nos. 46–2, 46–3, at 45 (Compl. ¶¶ 10–13, *Colonial Sur. Co. v. DME Constr. Assocs. (Colonial)*, No. 1:09–cv–956 (M.D.Pa. May 21, 2009), Dkt. No. 1). Colonial later amended the District Court complaint to add the Navy as a defendant, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. & Def.'s Cross–Mot. for Summ. J. (defendant's Motion or Def.'s Mot.), Dkt. No. 46, at 11; the District Court dismissed four of Colonial's claims against the Navy and transferred the remaining two claims to this court, Def.'s App. 73 (Order of Sept. 13, 2010 at 1, *Colonial*, No. 1:09–cv–956 (M.D.Pa. Sept. 13, 2010), Dkt. No. 58). The District Court granted Colonial's motion for summary judgment against the remaining defendants, finding that they had breached their indemnity agreement with Colonial, Def.'s App. 117–18 (*Colonial*, No. 1:09–cv–956, 2011 WL 703601, at *8, 2011 U.S. Dist. LEXIS 16493, at *22–23 (M.D.Pa. Feb. 18, 2011)), and, after additional discovery, issued a judgment against the remaining defendants in the amount of $556,449.76 in favor of Colonial, *id.* at 123 (*Colonial*, No. 1:09–cv–956, 2011 WL 4592569, at *6, 2011 U.S. Dist. LEXIS 112220, at *17 (M.D.Pa. Sept. 30, 2011)).

4. Colonial Surety Company's Notice of Motion … for Partial Summary Judgment, Dkt. No. 45–2, and Brief of Colonial Surety Company in Support of Its Motion for Partial Summary Judgment (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 45–4, were filed as attachments to the Affidavit of Larry Miller in Support of Colonial Surety Company's Motion for Partial Summary Judgment (Miller Affidavit), Dkt. No, 45. The Miller Affidavit includes two exhibits, the Deposition of William Ganter and the Deposition of Joseph W. Yates, labeled Exhibits A and B, respectively. When citing to the exhibits associated with the Miller Affidavit, the court cites to the exhibit letter provided by plaintiff followed by the page number assigned by the court's electronic case filing system that appears at the top of the referenced page.

Also attached to the Miller Affidavit are the Affidavit of Wayne Nunziata in Support of Colonial Surety Company's Motion for Partial Summary Judgment (Nunziata Affidavit), Dkt. No. 45–3, at 1–9, and several exhibits to the Nunziata Affidavit, labeled A through G, *id.* at 10–36. When citing to the exhibits associated the Nunziata Affidavit, the court cites to the exhibit letter provided by plaintiff followed by the page number assigned by the court's electronic case filing system that appears at the top of the referenced page.

5. Also attached to defendant's Motion is the Declaration of Lucie J. McDonald Pursuant to 28 U.S.C. § []1746 in Support of Defendant's Opposition to Plaintiff's Motion and in Support of Defendant's Cross–Motion for Summary Judgment (McDonald Declaration or McDonald Deck). Dkt. No. 46–1.

Surety Company in Support of its Motion for Partial Summary Judgment and In Opposition to Defendant's Cross–Motion (Pl.'s Reply), Dkt. No. 50,[6] filed September 21, 2012; and Defendant's Reply to Plaintiff's Response to Defendant's Cross–Motion for Summary Judgment (Def.'s Reply), Dkt. No. 51, filed October 9, 2012. DME was named as a third-party defendant in the government's Third Party Complaint, Dkt. No. 17, filed June 24, 2011. On June 28, 2011 the court issued a summons directing DME to answer the Third Party Complaint within forty-two days of receiving service of the summons. Dkt. No. 18, but DME has yet to file an answer, cf. Order of Nov. 19, 2012, Dkt. No. 54, at 1 (stating that "[i]f DME wishes to avoid default judgment against it in favor of the United States, DME shall answer the Third Party Complaint on or before Monday, December 10, 2012"). See generally dkt.

■ Plaintiff's total claimed damages in the Amended Complaint are $536,956.70. Am, Compl. ¶ 25. This amount comprises $249,743.78 that, plaintiff claims, was improperly paid by the Navy to DME, id. ¶ 18, fees paid to an on-site consultant, and attorneys fees, see id. at Ex. E (loss statement) 18–20 (itemizing payments to plaintiff's counsel and a consulting firm); Def.'s Mot. 11 (describing apparent breakdown of damages). In its Motion, plaintiff seeks partial summary judgment for $249,743.78 plus interest. PL's

Mot. 2, 22. Plaintiff relies on several legal theories in support of its Motion, including equitable subrogation, breach of the government's stakeholder duty and breach of contract.[7] See id. 4–10, 14–22. Defendant cross-moves for summary judgment with respect to "the total amount of damages sought by Colonial, $536,956.70." Def's Mot. 1. Defendant contends that plaintiff has failed to establish certain conditions precedent to recovery under an equitable subrogation theory and that plaintiff has failed to establish the existence of either an express or implied contract with the Navy. Id. at 15–29. Defendant does not dispute plaintiff's claim that the government breached its duty as a stakeholder. See generally id.

The court finds that genuine issues of material fact exist as to whether Colonial can rely on equitable subrogation to bring suit against the government and whether there exists an enforceable contract between Colonial and the Navy. Pending further discovery and briefing, it remains uncertain whether trial will be necessary to resolve these issues. For the reasons stated below, plaintiff's Motion is DENIED, and defendant's Motion is DENIED.

## I. Background [8]

"On September 28, 2007, DME and the Navy entered into a firm, fixed price construction contract, Contract N40085–07–C–

6. In conjunction with the Reply Brief of Colonial Surety Company in Support of its Motion for Partial Summary Judgment and In Opposition to Defendant's Cross–Motion (PL's Reply), Dkt. No. 50, plaintiff filed a Reply Affidavit of Wayne Nunziata (Nunziata Reply Aff.), Dkt. No. 47, a Reply Affidavit of Larry Miller (Miller Reply Aff.), Dkt. No. 48, and a Reply Affidavit of John C. Stos (Stos Reply Aff.), Dkt. No. 49.

7. Plaintiff also attempts to invoke an equitable lien theory as a basis for recovery. See Pl.'s Mot. 10–14. Plaintiff contends that "[i]t is universally recognized that a performing surety has an equitable lien against the remaining project funds for the purposes of obtaining reimbursement, if necessary." Id. at 10. According to plaintiff, Colonial had an equitable lien on the contract funds, which was created "the moment Colonial issued the bonds," id. at 14, and "the Navy clearly violated Colonial's equitable lien rights by wrongfully disbursing the $249,743.78 to DME," id. at 13. In support of its equitable

lien theory, plaintiff discusses cases that are neither binding on nor precedential for this court. See id. at 10–14.

An equitable lien theory of recovery is "based upon a contract implied in law, over which this court has not been given jurisdiction." (Aetna Cas. & Sur. Co. v. United States (Aetna), 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981); see Merritt v. United States, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925) ("The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law."). Accordingly, plaintiff's equitable lien theory of recovery is beyond the jurisdiction of this court. See Aetna, 228 Ct.Cl. at 164, 655 F.2d 1047 at 1059–60.

8. Material facts relied on in this Opinion and cited to the filings of only one of the parties do not appear to be in dispute.

4467 [ (the contract) ], to replace the roof at Buildings 203 and 204 at the Naval Support Activity in Mechanicsburg, [Pennsylvania]." Def.'s Mot. 3; *see* Def.'s App. 1–3 (contract).[9] To fulfill the bond requirement contained in the contract, DME secured from Colonial a payment bond in the amount of $1,347,500 and a performance bond in the amount of $2,695,000. *See* Am. Compl. Ex. A (Miller Act bonds) 2–3; Def.'s App. 3 (contract) (requiring contractor to furnish performance and payment bonds).

"In the summer of 2008, DME began experiencing difficulties performing the contract," Def.'s Mot. 4, and the Navy began to question DME's "ability to complete the project as required by the contract specification," Def.'s App. 11 (July 18, 2008 letter from William Ganter (Mr. Ganter) to DME (July 18, 2008 cure notice letter)). The contracting officer for the project, Mr. Ganter, conveyed the Navy's dissatisfaction with DME's performance in a July 18, 2008 cure notice letter addressed to DME, with a copy to Colonial. *See* Def.'s App. 9–11 (July 18, 2008 cure notice letter). The July 18, 2008 cure notice letter identified several items that were "deficient, incomplete or not in compliance with the contract requirements," *id.* at 9, and "afforded [DME] an opportunity to resolve the outstanding deficiencies, non-compliances and omissions" by submitting a plan to the Navy for its approval, *id.* at 11. Although it appears that DME responded to the July 18, 2008 cure notice letter, *see id.* at 12 (Aug. 14, 2008 letter from Mr. Ganter to DME (Aug. 14, 2008 cure notice letter)) (referencing a July 25, 2008 letter from DME), DME's response is not in the record.

The Navy sent two additional cure notice letters, with copies to Colonial, on August 14, 2008 and September 5, 2008, respectively. *See id.* at 12–13 (Aug. 14, 2008 cure notice letter); *id.* at 14–15 (Sept. 5, 2008 letter from Mr. Ganter to DME (Sept. 5, 2008 cure

notice letter)). Each of the letters identified additional areas of concern and requested a meeting between the Navy, DME and Colonial to address these concerns. *Id.* at 12–13 (Aug. 14, 2008 cure notice letter); *id.* at 14–15 (Sept. 5, 2008 cure notice letter) (also stating that DME had not set up a meeting as repeatedly requested). Each of the letters stated, in part, "The Government has lost all confidence in [DME's] quality control, supervision and ability to complete this contract and provide the government with a satisfactory product in a safe manner by the scheduled completion date," and advised that DME's "continued failure to comply with the contract requirements ... shall subject [DME] to adverse contractual action, including but not limited to our terminating the subject contract for default." *Id.* at 13 (Aug. 14, 2008 cure notice letter); *id.* at 15 (Sept. 5, 2008 cure notice letter).

Representatives of the Navy, DME and Colonial met on September 16, 2008 "to develop a mutually agreeable plan to assure the successful completion of the project." Id. at 20 (Oct. 16, 2008 letter from Mr. Ganter to Colonial (Oct. 16, 2008 letter)). Among those present were: Mr. Ganter, the contracting officer for the project; Lucie McDonald (Ms. McDonald), counsel for the Navy; Peter Chardon (Mr. Chardon), president of DME; Michael Rabinowitz, counsel for DME; and Larry Miller (Mr. Miller), counsel for Colonial. Def.'s Mot. 4–5; *see* Def.'s App. 18 (sign-in sheet for the meeting). The president of Colonial, Wayne Nunziata (Mr. Nunziata), was not present. Def.'s Mot. 5. Plaintiff and defendant give different accounts of this meeting.

Colonial claims that "the Navy demanded that Colonial directly pay all of DME's suppliers and subcontractors on the Project and[ ] that Colonial place a full time consultant on the Project site to ensure completion

---

**9.** The contract provided to the court was filed by defendant and consists of a three-page standard form prescribed by the United States General Services Administration. *See* Def.'s App. 1–3. The contract consists of three sections titled Solicitation, Offer and Award. *See id.; cf.* at 1 (stating that the contract "consists of (a) the Government solicitation and your offer, and (b) this contract award"). It is unclear to the court

whether these three pages constitute the entirety of the contract. *Cf. id.* at 1 (referencing an amendment to the solicitation); *id.* at 2 (requiring bidders to register on a web site to obtain "specifications and drawings" and stating that "[n]otification of any changes to this solicitation (i.e. amendments) shall be made only on the web site").

of the Project to avoid an immediate default termination of DME." *See* Am. Compl. ¶ 4 (stating that the Navy made these demands "on or about September 16, 2008," the date of the meeting). Colonial contends that it "agreed to the Navy's demands." *Id.* ¶ 5; *see also id.* ¶ 10 ("Colonial and the Navy agreed that Colonial would take over the Project by receiving and controlling all of the remaining contract funds and[ ] by ensuring completion of the Project through [a] full time on-site consultant.").

According to defendant's account of the meeting, the Navy did not demand either that Colonial complete the project or hire an on-site consultant. Def.'s Mot. 20. Instead, defendant claims that the parties "discussed a possible contract modification whereby payments would be made payable to DME, in care of Colonial, and mailed to Colonial's address." *Id.* at 5. Defendant also contends that "[t]he Navy requested that" Colonial consider retaining a consultant "but did not demand that Colonial do so." *Id.* Defendant states that "[n]o contract modification was executed at the meeting," and that "[i]t was contemplated that discussions would continue." *Id.*

On September 24, 2008 Colonial placed a consultant on the project site. PL's Mot. 2; Def.'s Mot. 5. The consultant was an employee of the consulting firm Cashin Spinelli & Ferretti, LLC (CSF). Def.'s Mot. 5; *see* Reply Aff. of John C. Stos [Senior Project Manager of CSF] (Stos Reply Aff.), Dkt. No. 49, ¶ 3 (stating that "CSF was engaged by Mr. Miller ... to perform consulting services"). According to defendant, "Representatives of the Navy were unsure what [the consultant's] responsibilities were and sought guidance [from Mr. Nunziata] as to how they should interface with him." Def.'s Mot. 5; see Def.'s App. 23–24 (Oct. 16, 2008 letter) (referring to communications on September 25, 2008 and September 30, 2008 in which Navy personnel requested to see a copy of the agreement defining the consultant's role);

cf. Def.'s App. 24 (Oct. 16, 2008 letter) (quoting a September 30, 2008 e-mail from Ms. McDonald to Mr. Miller in which Ms. McDonald stated, "There is nothing that defines [the consultant's] role. . . .").

On October 20, 2008, the president of Colonial, Mr. Nunziata, sent a stop-payment letter to the Navy requesting that the Navy cease making progress payments to DME. Am. Compl. Ex. B (Oct. 20, 2008 letter from Mr. Nunziata to Ms. McDonald (stop-payment letter)) 5–6. The stop-payment letter referred to "allegations of wage issues with regard to employees and non-performance issues" and noted that a claim had been filed against Colonial's payment bond by R & R Plaster & Drywall Co., Inc. (R & R Plaster). *Id.* at 5 (internal quotation marks omitted). The stop-payment letter "request[ed] that no further funds be released under the ... contract without the expressed written consent and direction of Colonial" and stated Colonial's intention to communicate with the Navy regarding procedures with respect to future payments. Id. at 5–6. The stated purpose of the stop-payment letter was "to ensure that project funds [were] utilized properly, namely to fund any and all project costs (including payments to subcontractors and suppliers)." *Id.* at 6. The stop-payment letter also stated that Colonial was "*not ... requesting that [the Navy] terminate DME ... on [the] project.*" *Id.* (emphasis in original).

On or about November 4, 2008 Mr. Ganter, Mr. Nunziata and Darlene Edwards (Ms. Edwards), vice president of DME, signed a modification to the contract between the Navy and DME.[10] Am. Compl. Ex, C (contract modification) 11–12; Def.'s Mot. 7. The contract modification provides that all future contract payments would be made payable to DME, in care of Colonial, and sent to Colonial's address. Am. Compl. Ex. C (contract modification) 12; Def.'s Mot. 7. The contract modification appears on the back of a General Services Administration standard form ti-

---

10. The parties dispute the effective date of the *contract modification.* Plaintiff claims that the contract modification was entered into on November 3, 2008, Am. Compl. ¶ 6. the date next to the signature of Darlene Edwards, Am. Compl. Ex. C (contract modification) 11. Defendant claims that the contract was entered into on November 4, 2008, Def.'s Mot. 7, the date next to the signature of William Ganter, Am. Compl. Ex. C (contract modification) 12. The precise date of the contract modification is not relevant to the court's resolution of the case.

tled "Amendment of Solicitation/Modification of Contract" and states, in full:

1. As a result of this modification, [DME] agrees to have all future contract payments diverted to [Colonial] for the remainder of the contract duration.

2. To ensure timely payment to subcontractors, employees and suppliers, [DME] further agrees that all additional contract payments will be made payable as follows:

DME Construction Associates, c/o Colonial Surety Company 50 Chestnut Ridge Road Montvale, NJ 07645

In order to effect such change in payment, the payee address is changed as follows:

DME Construction Associates, c/o Colonial Surety Company 50 Chestnut Ridge Road Montvale, NJ 07645

3. Execution of this modification does not constitute an admission of liability or fault on the part of either party or any of its present or former officials, employees or agents. This modification constitutes the entire understanding between the parties regarding and arising from the subject matter.

Am. Compl. Ex. C (contract modification) 11–12. Notably, the contract modification does not include a provision for the retention of an on-site consultant or project manager. *See id.*

"In order to implement [the contract modification], Mr. Ganter made special arrangements with the Defense Finance Accounting Service (DFAS)," which normally employs electronic fund transfers to make progress payments, Def.'s Mot. 7. "Mr. Ganter requested instead that payments be in paper check made payable to DME ..., in care of Colonial ..., and mailed to Colonial." Id. at 8. On November 14, 2008 and January 7, 2009, DFAS issued two paper checks, for $733,932.67 and $375,500.26, respectively, in accordance with Mr. Ganter's instructions and the contract modification. *Id.*; *see* Def.'s App. 32 (copy of the $733,932.67 check), 34 (copy of the $375,500.26 check). However, on March 20, 2009, after DME had completed the project,[11] DFAS sent a final payment of $249,743.78 to DME directly via an electronic fund transfer. Def.'s Mot. 8–9; *see* Am. Compl. ¶ 11.

"The Navy unsuccessfully attempted to recoup the misdirected payment" from DME. Def.'s Mot. 9; *see* Am. Compl. ¶ 12 ("Colonial and the Navy immediately demanded that DME deliver the funds to Colonial...."). "On July 12, 2010, the contracting officer sent a final decision to DME, making formal, final demand for return of the payment of $249,743.78." Def.'s Mot. 9; *see* Def.'s App. 41 (July 12, 2010 Contracting Officer's Final Decision (final decision)). "DME did not appeal the final decision to the Armed Services Board of Contract[ ] Appeals within 90 days of the date of the decision or to this Court within 12 months of the date of the decision."[12] Def.'s Mot. 9; *see also* Def.'s App. 43 (final decision) (describing procedures for appeal).

---

**11.** DME completed the project sometime in or between December 2008 and February 2009. *Compare* Def.'s App. 85 (Aff. of Peter Chardon ¶ 25, *Colonial*, No. 1:09–cv–956 (M.D. Pa. Nov. 8, 2010), Dkt. No. 66) (stating that DME completed the project on December 23, 2008), *and id.* at 96 (Feb. 20, 2009 letter from the Navy to DME) (stating that the project "was substantially complete effective 23 December 2008"), *with* Stos Reply Aff. ¶ 7 (stating that "[t]he Project was completed on or about February 4, 2009"), *and* Nunziata Reply Aff. ¶ 9 (same).

**12.** The "Contracting Officer's Final Decision" does not state under what authority it was issued. *See* Def.'s App. 41–43 (July 12, 2010 Contracting Officer's Final Decision (final decision)). The final decision does state, however, that DME could appeal the decision either "to the agency board of contract appeals" or to "the United States Court of Federal Claims [ (Court of Federal Claims) ] (except as provided in the Contract Disputes Act of 1978 [ (CDA) ] ... regarding Maritime Contracts) within 12 months of the date [DME] receive[s] this decision." *Id.* at 43; *cf. id.* at 41–43 (stating that, after thirty days, interest on the Navy's demand would accrue at the rate "provided in Section 12 of the [CDA]"). Based on the foregoing, the court understands that the Final Decision was issued pursuant to the CDA. *See* 41 U.S.C. § 7104(b)(1), (3) (2006) (stating that an appeal of a contracting officer's final decision to the Court of Federal Claims must filed "within 12 months from the date of receipt of a contracting officer's [final] decision").

According to plaintiff, "Colonial satisfied all of the claims of suppliers, labor claims, and subcontractors on the Project," Am. Compl. ¶ 23, and "funded the completion of the bonded project," *id.* ¶ 24. Plaintiff contends that, between October 29, 2008 and January 11, 2010, Colonial made $1,375,261.39 in payments to various subcontractors and suppliers and to DME for labor and expenses. *See* Reply Aff. of Wayne Nunziata (Nunziata Reply Aff.), Dkt. No. 47, ¶ 15; Am. Compl. Ex. E (loss statement) 18 (itemizing DME's expenses).

## II. Legal Standards

### A. Jurisdiction

▆ "[T]he United States may be sued only to the extent that it allows its sovereign immunity to be waived." *United Electric Corp. v. United States,* 227 Ct.Cl. 236, 240, 647 F.2d 1082, 1084 (1981). The Tucker Act, 28 U.S.C. § 1491 (2006), "serves as both a waiver of sovereign immunity and a jurisdictional grant for this court." *Liberty Mut. Ins. Co. v. United States (Liberty Mut.),* 70 Fed.Cl. 37, 41 (2006). The Tucker Act provides that the United States Court of Federal Claims (Court of Federal Claims) has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Although, with respect to the types of claims specified, the Tucker Act waives the sovereign immunity necessary for a plaintiff to sue the United States for money damages, *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), it does not confer any substantive rights upon a plaintiff, *United States v. Testan,* 424 U.S. 392, 398–401, 96 S.Ct. 948, 47

L.Ed.2d 114 (1976). A plaintiff must establish an independent substantive right to money damages from the United States—that is, a money-mandating source within a contract, regulation, statute or constitutional provision—in order for the case to proceed. *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.,* 525 F.3d 1299, 1306 (Fed.Cir.2008).

### B. Cross–Motions for Summary Judgment

Under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a), The moving party has the initial burden of establishing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent Techs., Inc.,* 255 F.3d 1361, 1366 (Fed.Cir.2001). The nonmoving party then bears the burden of establishing, by a showing of specific facts, that there are genuine issues of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[13] A fact is material if it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, the court draws all inferences in favor of the non-moving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Mann v. United States,* 334 F.3d 1048, 1050 (Fed.Cir.2003). When parties cross-move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance

---

**13.** The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP). See RCFC 56 rules committee note (2008 amendment) ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541 n.2 (Fed.Cir.1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in

pertinent part, identical to [FRCP] 56(c)."); *Flowers v. United States,* 75 Fed.Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."), *aff'd,* 321 Fed.Appx. 928 (Fed.Cir.2008) (per curiam) (unpublished). Accordingly, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

### C. Equitable Subrogation and the Government's Stakeholder Duty

■■■ "A surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)." *Ins. Co. of the West v. United States (ICW )*, 243 F.3d 1367, 1370 (Fed.Cir.2001). "Surety bonds are integral to the government contracting process, for through the surety system the government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety," *Nat'l Sur. Corp. v. United States,* 118 F.3d 1542, 1547 (Fed.Cir.1997). A surety that wishes to assert a claim against the government as obligee may do so under the doctrine of equitable subrogation. *Balboa Ins. Co. v. United States (Balboa),* 775 F.2d 1158, 1160–61 (Fed.Cir.1985). Equitable subrogation "is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136 n.12, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (internal quotation marks omitted); *see Nat'l Sur. Corp.,* 118 F.3d at 1546 ("The subrogation right is equitable, in origin and in implementation and is established when the surety bonds are given." (internal citation omitted)).

■■■ A surety may bring suit under the Tucker Act, even when it lacks privity of contract with the government, by relying on equitable subrogation "to step into the shoes" of the government contractor. *Nat'l Am. Ins. Co. v. United States,* 498 F.3d 1301, 1304 (Fed.Cir.2007); *see ICW,* 243 F.3d at 1375 (holding that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States"). "Although the right of sub-

rogation itself is an equitable principle, and this court traditionally does not have jurisdiction over suits in equity, the law traditionally has treated the subrogated party as if it were itself in privity of contract with the government. . . ." *Liberty Mut.,* 70 Fed.Cl. at 43 (footnote omitted), "The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal contractor's] property rights in the contract balance.' " *Lumbermens Mut. Cas. Co. v. United States (Lumbermens )*, 654 F.3d 1305, 1312 (Fed. Cir.2011) (alterations in original) (quoting *Balboa,* 775 F.2d at 1161); *see Pearlman,* 371 U.S. at 138, 83 S.Ct. 232 ("[T]here are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed."). A surety's right of subrogation relates back to the date of the execution of the surety's bonds. *Balboa,* 775 F.2d at 1161.

■■■ "A surety can establish a right of subrogation in either of two ways: by completing the contract pursuant to its obligation under the performance bond or by paying off materialmen's claims brought under the payment bond." *Transam. Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 312 (1994). A surety that performs its obligations under either a payment bond or performance bond becomes subrogated to the rights of the contractor under the contract, *see Nat'l Am. Ins. Co.,* 498 F.3d at 1307 ("[A] payment bond surety that discharges a contractor's obligation to pay a subcontractor may be equitably subrogated to the rights of the contractor."); *Westchester Fire Ins. Co. v. United States,* 52 Fed.Cl. 567, 574–75 (2002) ("When a surety takes over contract performance or finances completion of the defaulted contract, it is subrogated to the contractor's rights against the Government under the contract."), and "may rely on the waiver of sovereign immunity in the Tucker Act" to bring suit against the government,[14] *Nat'l Am. Ins.*

---

14. A surety need only show that it has discharged the obligations of one of its bonds in order to assert its equitable subrogation rights. *Nova*

*Cas. Co. v. United States,* 69 Fed.Cl. 284, 296 (2006) ("[T]he Tucker Act supplies a waiver of sovereign immunity for a surety making a claim

*Co.,* 498 F.3d at 1307 (internal quotation marks omitted).

A surety that is equitably subrogated to the rights of a contractor can seek to recover from the government either "contract funds still held by the Government as retainage" or "contract funds [that] had been disbursed to the contractor after the surety notified the Government of the contractor's default." *Ins. Co. of the West v. United States,* 83 Fed.Cl. 535, 538 (2008). Notice by the surety that the contractor is in default—or approaching default—"and that the surety is invoking its rights to the remaining con-

tract proceeds[,] converts the government into a stakeholder with duties to the surety; the [surety], by virtue of being subrogated to the rights of [the contractor], is then able to sue under the Tucker Act." *Am. Ins. Co. v. United States,* 62 Fed.Cl. 151, 155 (2004); *see Hartford Fire Ins. Co. v. United States (Hartford),* No. 11–499C, 108 Fed.Cl. 525, 535, 2012 WL 5194055, at *9 (Fed.Cl. Oct. 22, 2012) ("[N]otice that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the government into a stakeholder with duties to the surety.").

---

of equitable subrogation after having satisfied its obligations under a payment bond, just as the Tucker Act also serves that purpose for a surety who has satisfied a performance bond.").

Although "there is no difference between the posture of the two sureties" for the purposes of the government's waiver of sovereign immunity, *id.* a surety that discharges its performance bond obligations "has different and more expansive rights" than a surety that discharges its payment bond obligations, *Hartford Fire Ins. Co. v. United States (Hartford),* No. 11–499C, 108 Fed.Cl. 525, 532, 2012 WL 5194055, at *5 (Fed.Cl. Oct. 22, 2012). "Unlike a payment bond surety, a performance bond surety may recover from retained contract funds the amount it expended in completing the contract free from set-off for taxes owed by the contractor." *Hartford,* 108 Fed.Cl. at 531, 2012 WL 5194055, at *5; *see U.S. Fid. & Guar. Co. v. United States (USF & G ),* 201 Ct.Cl. 1, 12, 475 F.2d 1377, 1383 (1973) ("A surety that pays on a performance bond in order to complete the subject contract has priority over the United States to the retainages in its hands. A surety that pays on its payment bond, however, does not have priority when the United States is asserting a tax or other obligation owed by the prime contractor."); Philip L. Bruner & Patrick J. O'Connor, Jr., 4A Bruner & O'Connor on Construction Law § 12:106 (2012) (discussing the different set-off rights of performance and payment bond sureties). This is because a performance bond surety is "entitled to the funds in the hands of the government not as a creditor subject to set-off, but as a subrogee having the same right to the funds as the government." *Sec. Ins. Co. of Hartford v. United States (Sec. Ins. Co.),* 192 Ct.Cl. 754, 762, 428 F.2d 838, 842 (1970). That is, a performance bond surety that discharges its obligations is equitably subrogated to the rights of both the prime contractor and the government itself. *See Dependable Ins. Co. v. United States,* 846 F.2d 65, 67 (Fed.Cir.1988) (stating that a performance bond surety "becomes subrogated not only to the rights of the prime contractor but to those of the government"); *U.S. Sur. Co. v. United States,* 83 Fed.Cl. 306, 311 (2008) ("[W]here a surety takes over contract performance, the surety succeeds to the

contractual rights of both the defaulted contractor and the government." (citing *Sec. Ins. Co.,* 192 Ct.Cl. at 762, 428 F.2d at 842)).

By contrast, payment surety that discharges its obligations is equitably subrogated to the rights of the prime contractor and the rights of the subcontractors and materialmen. *See Nat'l Am. Ins. Co. v. United States,* 498 F.3d 1301, 1306–07 (Fed.Cir.2007); *Liberty Mut. Ins. Co. v. United States (Liberty Mut.),* 70 Fed.Cl. 37, 52 (2006) ("[A] surety that honors a Miller Act payment bond is subrogated *both* to the rights of the subcontractors or materialmen to whom it makes payment *as well as* the prime contractor on whose behalf such payments are made."). The United States Court of Claims (Court of Claims), in its appellate capacity the predecessor to the United States Court of Appeals for the Federal Circuit (Federal Circuit), has explained the rights of payment bond sureties, contractors and subcontractors to sue the United States:

[T]he surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the [prime] contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

*USF & G,* 201 Ct.Cl. at 10, 475 F.2d 1377 at 1382; *accord Balboa Ins. Co. v. United States (Balboa),* 775 F.2d 1158, 1161 (Fed.Cir.1985). Accordingly, although a payment bond surety's equitable rights may stem from its subrogation to the subcontractors and materialmen, "its standing to sue..., comes from the fact that it is also subrogated to, and stands in the shoes of, the [prime] contractor, an entity which is clearly in privity of contract with the Government." *United Electric Corp. v. United States,* 227 Ct.Cl. 236, 242, 647 F.2d 1082, 1086 (1981).

Because Colonial is not seeking recovery of funds retained by the government, the distinction between performance bond sureties and payment bond sureties is not applicable here.

■■■ Therefore, where (as here) a surety seeks to recover funds that, it claims, have been improperly disbursed, the surety must notify the government when it knows of or anticipates the contractor's default. *See Commercial Cas. Ins. Co. of Ga. v. United States*, 71 Fed.Cl. 104, 112 n.10 (2006) (stating that a surety can assert a contractor's claim to funds that have been improperly disbursed by the government if the surety has given notice to the government of the contractor's default); *cf. Hartford*, 108 Fed. Cl. at 535, 2012 WL 5194055, at *10 ("[N]otice of even a *potential* default can suffice to trigger the government's stakeholder duty."). That is, "Equitable subrogation can be used to recover improper payments to a principal [contractor] only if made after the [government] received notice of the principal [contractor's] default (i.e., notice that the bond obligation has been triggered and an implied assignment of the contract rights to the surety has occurred)." *Lumbermens*, 654 F.3d at 1312; *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed.Cir.1990) (stating that "only notice by the surety triggers the government's equitable duty"). The government's equitable duties as a stakeholder relate back to the date of notification. *Balboa*, 775 F.2d at 1162.

### D. Breach of Contract

■■■ "To recover against the government for an alleged breach of contract, there must be, in the first place, a binding agreement." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003). A binding agreement with the government requires proof of "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Id.* "[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir.2003), An implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit under-

standing." *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *cf. Scott Timber Co. v. United States*, 97 Fed.Cl. 685, 696 (2011) ("Acceptance of an offer can be manifested by [a party's] conduct, and conduct alone can create an implied-in-fact contract."), *rev'd on other grounds*, 692 F.3d 1365 (Fed.Cir.2012).

### III. Discussion

#### A. The Government Has Violated Its Stakeholder Duty but Genuine Issues of Material Fact Exist as to Whether Colonial Is Equitably Subrogated to the Rights of DME

Although the court finds that the government violated its stakeholder duty-which arose when Colonial notified the government of DME's actual or potential defaults under the contract-by disbursing $249,743.78 to DME in violation of the contract modification, *see infra* Part III.A.2, there remain genuine issues of material fact as to whether Colonial's right to equitable subrogation attached under either its performance bond or payment bond such that Colonial can step into the shoes of DME to sue the government.

#### 1. Genuine Issues of Material Fact Exist as to Whether Colonial Can Rely on Equitable Subrogation to Step into the Shoes of DME to Bring Suit Against the Government

Plaintiff contends that "Colonial, as surety, acquired as of the date of issuing the bonds certain inchoate equitable rights which could be asserted on principles of subrogation in the event that Colonial was called upon to satisfy any of DME's bonded contractual obligations." Pl.'s Mot. 7. According to plaintiff, Colonial "became subrogated to all of DME's rights under the bonded contract" by discharging its duties under both the performance bond and payment bond. *See* Am. Compl. ¶ 48. Specifically, plaintiff contends that Colonial "performed all of DME's obligations to fund the completion of the Project" pursuant to the performance bond and "paid all suppliers of labor and materials on the Project" pursuant to the payment bond.

*See id.*; Pl.'s Mot. 5 ("[A] surety's equitable subrogation rights give it priority to the contract funds when it completes the performance of the contractor's obligations as Colonial did for the Navy.").

Defendant argues that Colonial lacks standing to assert its right of equitable subrogation under either bond. Defendant argues that Colonial's attempt to invoke its equitable rights pursuant to its performance bond fails "because Colonial's performance bond obligations were never triggered," Def.'s Mot. 13, that is, "the Government never called upon Colonial to take over performance pursuant to its performance bond," so any "[a]ctions taken by the surety to finance the project prior to a termination were voluntary," *id.* at 25. With respect to Colonial's payment bond claim, defendant concedes that "Colonial may bring suit pursuant to its payment bond to recover amounts paid to subcontractors up to the amount of the misdirected payment," but argues that "Colonial must prove that it satisfied all payment bond claims as a prerequisite to suit." Def.'s Reply 2. And, according to defendant, plaintiff has failed to establish that Colonial has satisfied all payment bond claims. Def.'s Mot. 13; *see also id.* at 25 (same). The court considers whether Colonial's equitable subrogation rights attach under either bond next.

### a. The Performance Bond

Defendant argues that, because the Navy never terminated DME for default and because DME completed the project, Colonial's obligations under the performance bond were never triggered. Def.'s Mot. 27. Defendant further contends that the Navy "did not make demand upon the surety for completion of the work upon the contractor's default in accordance with the surety's obligations under its performance bond." *Id.*; *see* Decl. of Lucie J. McDonald Pursuant to 28 U.S.C. § [ ] 1746 in Supp. of Def.'s Opp'n to Pl.'s Mot. & in Supp. of Def.'s Cross–Mot. for Summ. J. (McDonald Deck), Dkt. No. 46–1, ¶ 9 (stating that the Navy never "state[d] DME was in default (or 'material breach') of its contract with the Navy, demand[ed] the surety take over the job or pay all DME's costs to complete, or state[d] DME would be

defaulted unless the surety 'took over' the job or placed a full-time consultant on the job"). Therefore, according to defendant, "Colonial voluntarily chose to incur costs related to the project as a measure to mitigate its possible damages if DME ultimately was not able to complete the project." Def.'s Reply 8; *see* Def.'s Mot. 28 ("[I]t was in Colonial's interest to assist DME even without a formal takeover agreement/demand by the Navy to complete the project because Colonial, as the performance bond surety, would ultimately be responsible for performing any work left uncompleted by DME.").

Plaintiff does not dispute defendant's theory, but argues, instead, that the Navy did "declare[ ] DME in default of the bonded contract," Am. Compl. ¶ 44; *see id.* ¶ 3, and "demanded that Colonial take over completion of the Project under its performance bond," *id.* ¶ 42; *see* Pl.'s Mot. 1–2 ("The Navy demanded that Colonial take over the completion of the Project through a full time consultant and by controlling the contract funds as a condition of avoiding a default termination of DME.").

There is support for defendant's contention that, absent triggering of the bond obligations, any actions taken by the surety to perform under the bonds are voluntary. *See Anderson v. United States*, 97 Ct.Cl. 545, 550 (1942) ("Anyone who is under no legal obligation or liability to pay the debt is a stranger, and, if he pays the debt, a mere volunteer.") (internal quotation marks and emphasis omitted). However, at this stage of the proceedings, the court is not persuaded that the Navy was required to have terminated DME for default or demand that Colonial complete the project in order to trigger Colonial's performance bond obligations.

Case law binding on this court provides that "a surety's obligation matures when a contractor defaults under the contract." *Ins. Co. of N. Am. v.United States*, 951 F.2d 1244, 1246 (Fed.Cir.1991) (internal quotation marks and alterations omitted); *see Balboa*, 775 F.2d at 1161 ("When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bonds."); *cf. De-*

*pendable Ins. Co. v. United States*, 846 F.2d 65, 66 (Fed.Cir.1988) ("Under a performance bond, a surety guarantees that the project will be completed if a contractor defaults."). However, the terms of the performance bond may provide that certain events are preconditions to the triggering of the surety's obligations under the bond. *See, e.g., Liberty Mut. Ins. Co. v. Constr. Mgmt. Servs., Inc.*, No. 99C6906, 2004 WL 2271811, at *3 (N.D.Ill. Oct. 6, 2004) (finding declaration of default a condition precedent to triggering surety's performance bond obligations when the language of the bond so provided). In this case, the performance bond provides that Colonial, as surety, is jointly and severally liable for the amount of the performance bond and that this obligation is void only if DME "[p]erforms and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies)."[15] Am. Compl. Ex. A (Miller Act bonds) 3 (performance bond).

To the extent that defendant relies on *Liberty Mutual Insurance Co.*, 2004 WL 2271811, *Transamerica Premier Insurance Co. v. K & S Construction*, 850 F.Supp. 930 (D.Colo.1994), and *Gearing v. Check Brokerage Corp.*, 233 F.3d 469 (7th Cir.2000), as support for the proposition that, when an obligee does not declare a contractor in default, any act by a surety to fund completion of the project is voluntary, see Def.'s Mot. 27–28, the court notes that these cases are not precedential and are distinguishable on their facts.

In an argument similar to the government's argument here, the obligee in *Liberty Mutual Insurance Co.* argued that "a condition precedent to Liberty Mutual's obligations under the performance bond is that the [obligee] . . . must declare the [the contractor] in default before Liberty Mutual can remedy any such default." 2004 WL 2271811, at *2. The United States District

Court for the Northern District of Illinois agreed. *See id.* at *3. However, the performance bond in *Liberty Mutual Insurance Co.* specifically included language that required the obligee to declare the principal in default before the surety's obligations were triggered, *id.* whereas the performance bond at issue here does not include such language, *see* Am. Compl. Ex. A (Miller Act bonds) 3 (performance bond).

*Transamerica Premier Insurance Co.* involved a dispute between a contractor and a surety regarding an indemnity agreement between the two entities. 850 F.Supp. at 930–31. The indemnity agreement specifically provided that "[i]n the event of Default . . . Surety may at its option and sole discretion" provide financial assistance to the contractor. *Id.* at 931, 934. The United States District Court for the District of Colorado (Colorado District Court) found that the surety "did not breach the implied covenant of good faith and fair dealing when, with [the contractor] in default, it exercised its discretion and refused to grant [the contractor] financial assistance." *Id.* at 934. To the extent that the Colorado District Court found that the "surety had no obligation to provide financing," *see* Def.'s Mot. 27 (characterizing *Transamerica Premier Insurance Co.*), any such finding is specific to the terms of the indemnity agreement in that case.

Finally, *Gearing* involved an agreement by a debt collection agency to purchase bad checks from a convenience store in an attempt to profit from an Illinois law that provided that "the payee of a bad a check, or a person subrogated to the rights of the payee" may recover certain damages from individuals who write bad checks. 233 F.3d at 471. The agreement included a recourse provision, under which the debt collection agency had an "absolute right to cancel its purchase of the checks after 60 days." *Id.* at 472. The United States Court of Appeals for the Seventh Circuit held that the recourse provision rendered the debt collection agency

---

**15.** "Contract interpretation begins with the plain language of the written agreement." *McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1380 (Fed. Cir.2010). "Thus, if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996) (internal citation and quotation marks omitted).

"a mere volunteer" and that it was therefore not subrogated to the rights of the convenience store. *Id.* The court stated that the debt collection agency "had no obligation to come to [the convenience store's] aid, for any 'obligation' to [the convenience store], given the escape clause, was really no 'obligation' at all," *Id.* Here, neither party contends that the performance bond includes a provision that allows Colonial to escape its obligations.

The record indicates that DME failed to "[p]erform[ ] and fulfill[ ] all the undertakings, covenants, terms, conditions, and agreements of the contract." *See* Am. Compl. Ex. A (Miller Act bonds) 3 (performance bond); Def.'s App. 9–10 (July 18, 2008 cure notice letter) (identifying several items that were "deficient, incomplete' or not in compliance with the contract requirements"); *id.* at 12–13 (Aug. 14, 2008 cure notice letter) & 14–15 (Sept. 5, 2008 cure notice letter) (identifying concerns with DME's performance and referring to DME's "continued failure to comply with the contract requirements"); McDonald Decl. ¶ 3 (stating that "several problems with DME's performance were brought to [her] attention, including labor violations, subcontractor and supplier complaints of late payments, safety violations, and concerns as to whether the roofs being constructed by DME could be warranted"); Aff. of Wayne Nunziata in Supp. of Colonial Sur. Co.'s Mot. for Partial Summ. J. (Nunziata Aff.), Dkt. No. 45–3, ¶ 4 (referring to "non-performance issues" related to "DME's defaults"). However, given that the parties have neither addressed the provisions of the performance bond, nor the provisions of the contract, cf. *supra* note 9 (noting that it is unclear whether the entire contract is before the court), additional evidence and briefing and, perhaps, trial will be necessary to resolve whether Colonial's performance bond obligations were triggered.

■ In order for Colonial's right to equitable subrogation to attach under its performance bond, Colonial must also prove that it discharged its performance bond obligations. A performance bond surety may discharge its obligations by taking over the contract and completing performance, "assuming liability for the government's costs in completing the contract" that exceed the contract price, or by "provid[ing] funds to an insolvent contractor to complete performance." *ICW*, 243 F.3d at 1370; *see also Nelson Constr. Co. v. United States*, 79 Fed. Cl. 81, 90 (2007).

Plaintiff contends that it "[took] over completion of the Project under its performance bond ... [by] placing a full time consultant on site and funding the completion of the Project." *See* Am. Compl. ¶¶ 42, 45; Pl.'s Reply 4 (stating that "Colonial agree[d] to: (1) control the project funds; (2) pay all completion costs; and, (3) place a full time consultant on the payment site" in accordance with the Navy's "demands of a project takeover"); PL's Reply 3 (arguing that Colonial discharged its performance bond obligations by paying "all of the completion costs just as [the Navy] demanded").

Relying on its argument that Colonial's performance bond obligations were never triggered, defendant contends that any costs incurred by Colonial in "allegedly financ[ing] completion of the contract" or in retaining an on-site consultant were "costs incurred to protect the surety's interests." Def.'s Mot. 28. Defendant also argues that the Navy never "arrange[d] for Colonial to complete the project" and that "[t]he only arrangement in place consisted of payments made payable to DME, in care of Colonial, and mailed to Colonial's address." *Id.*; *see* McDonald Decl. ¶ 13 ("The Navy never directed the surety to finance DME's costs to complete the project, ... and the Navy never would provide any such directive or make such a demand without having first terminated the contractor for default.").

■ The record supports plaintiff's contention that Colonial funded completion of the project. There is evidence that Colonial made substantial payments to materialmen and subcontractors, which the court addresses below in Part III.A.1.b, as well as evidence that Colonial paid DME over $270,000 to complete the project. Am. Compl. Ex. E (loss statement) 18 (listing payments made by Colonial); Def.'s Mot. 8 (acknowledging payments made by Colonial); *see also* Nunziata Aff. ¶ 18 (stating that Colonial "paid all Project costs subsequent to September 16,

2008"). The record also suggests that Colonial hired a full-time consultant to assist in ensuring project completion. Am. Compl. Ex. E (loss statement) 18–19 (listing payments made to CSF). However, it is not clear whether these costs were incurred pursuant to Colonial's performance bond obligations. *See* McDonald Decl. ¶ 8 ("If plaintiff had actually 'taken over' DME's contract, . . . payments would not have been authorized to DME. But, payments were authorized to be made payable to DME, 'in care of the surety and sent to the surety's address. The surety was merely assisting with, and facilitating, DME's performance, not taking it over."); *id.* ¶ 18 (reproducing an October 3, 2008 e-mail to Mr. Miller in which Ms. McDonald states that the Navy never demanded that Colonial hire a full-time consultant, but, instead, that the parties "all agreed that the Surety would assist with provision of a consultant"). Given the foregoing disputed matters in the record, further proceedings are necessary to resolve whether, as Colonial asserts, its costs were incurred in the discharge of its obligations under the performance bond. Summary judgment as to this portion of plaintiff's claim is therefore precluded.

b. The Payment Bond

The payment bond provides that Colonial is jointly and severally liable to the government on the payment bond and that this obligation is void only if DME timely pays all subcontractors and materialmen. Am. Compl. Ex. A (Miller Act bonds) 2 (payment bond). It is undisputed that Colonial's payment bond obligations were triggered. *See* PL's Mot. 7 ("DME failed to perform its obligations to pay its suppliers and subcontractors . . . ."); *accord* Am. Compl. Ex. B (stop-payment letter) 5 (stating that a claim had been filed against Colonial's payment bond by R & R Plaster); Def.'s App. 22 (Oct. 16, 2008 letter) (stating that on approximately September 23, 2008 the Navy was notified that DME was sixty days behind in paying Cumberland Analytical Associates, LLC (Cumberland)); Def.'s App. 337 (Dep. of William Ganter) ("I know we had multiple claims from subcontractors for nonpayments."); McDonald Decl. ¶ 3 (stating that, in the summer of 2008, she became aware of "subcontractor and supplier complaints of late payments").

 A threshold requirement for asserting the doctrine of equitable subrogation under a payment bond is proof that the surety has paid "all of the outstanding claims owed by [the contractor]." *U.S. Fid. & Guar. Co. v. United States*, 201 Ct.Cl. 1, 8, 475 F.2d 1377, 1381 (1973).[16] Although the parties agree that Colonial made substantial payments to DME's subcontractors, suppliers

---

16. In *USF & G*, the payment bond surety argued, inter alia, that a "progress payment made by the Navy to [the contractor] . . . over the surety's protest was improper and a violation of the surety's right of subrogation." 201 Ct.Cl. at 13, 475 F.2d at 1384. Finding that the payment-bond surety had "not paid the[ ] subcontractors in full," the Court of Claims granted the government's motion for summary judgment. *Id.* at 16, 475 F.2d at 1385. However, the Court of Claims afforded the surety the opportunity to obtain a rehearing if, "within 60 days from entry of this judgment, the surety shows to the court that it has paid the subcontractors in full." *Id.*; see *Int'l Fid. Ins. Co. v. United States*, 25 Cl.Ct. 469, 474 (1992) (discussing *USF USF & G* and stating that "[i]n other cases, the Court of Claims has conditioned judgment for the surety on the filing of proof that all subcontractors were paid" (citing *Am. Fid. Fire Ins. Co. v. United States*, 206 Ct.Cl. 570, 513 F.2d 1375 (1975); *N. Denver Bank v. United States*, 193 Ct.Cl. 225, 432 F.2d 466 (1970))); *accord Commercial Cas. Ins. Co. of Ga. v. United States*, 71 Fed.Cl. 104, 113 (2006) (denying the government's motion for summary

judgment on the condition that the payment-bond surety "fil[e] a receipt from [an unpaid subcontractor] indicating that it has been paid in full within 60 days"); *Liberty Mut.*, 70 Fed.Cl. at 54–55 (denying the government's motion for summary judgment, finding that whether "the claims that plaintiff has paid constitute 'all' of the outstanding claims is a factual issue" and that "plaintiff at some point will be required to demonstrate that it has in fact paid 'all' claims").

Given the binding authority on this issue, the court finds it unnecessary to look to non-precedential cases that, according to plaintiff, support the proposition that "a surety's subrogation rights have been often recognized before all claimants have been paid." *See* Pl.'s Mot. 8–9 (discussing *Fid. & Deposit Co. of Md. v. Hay*, 9 F.2d 749 (3d Cir.1926) and *In re Modular Structures, Inc.*, 27 F.3d 72 (3d Cir.1994)); *see also id.* (citing *United States v. Pa. Dep't of Highways*, 349 F.Supp. 1370 (E.D.Pa.1972) and *Atl. Ref. Co. v. Cont'l Cas. Co.*, 183 F.Supp. 478 (W.D.Pa.1960) in further support of this proposition).

and laborers, *see* Am. Compl. Ex. E (loss statement) 18; Def.'s Mot. 6, 8 (acknowledging payments by Colonial to subcontractors, suppliers and laborers), defendant contends that a payment-bond surety's standing "depend[s] on proof of full payment," Def.'s Mot. 25–26. According to defendant, "Colonial has not presented evidence of each of its payment bond claims and its subsequent payment of each of those claims." *Id.* at 26; *see* McDonald Decl. ¶ 13 (acknowledging that Colonial "made some payments to some of DME's subcontractors and suppliers (but not all)" under the payment bond). In reply, Colonial contends that it "paid all legitimate payment bond claims." Pl.'s Reply 6 n.3; see Am. Compl. ¶ 23 ("Colonial satisfied all of the claims of suppliers, labor claims and subcontractors on the Project.").

The parties dispute whether Colonial satisfied a payment bond claim submitted by Cumberland. The Reply Affidavits of Wayne Nunziata, Larry Miller and John C. Stos (collectively, Reply Affidavits) claim that Colonial defended a claim by Cumberland because "it was improperly filed in a state court and was time barred."[17] Nunziata Reply Aff. ¶ 13 n.1; Reply Aff. of Larry Miller (Miller Reply Aff.), Dkt. No. 48, ¶ 13 n.1; Stos Reply Aff. ¶ 11 n.1 (capitalization altered); see Nunziata Reply Aff. ¶ 14 ("All bills of subcontractors and suppliers on the Project were paid by Colonial except the one time[-]barred claim."); Miller Reply Aff. ¶ 14 (same); Stos Reply Aff. ¶ 12 (same) (capitalization altered). Defendant contends that the identical language in these three Reply Affidavits regarding " 'the untimely claim of Cumberland,' " Def.'s Reply 6–7 (quoting Reply Affidavits), does not amount to "proof of the disposition of the Cumberland . . . lawsuit or proof of final payment to Cumberland," *id.* at 7.

The parties also dispute whether DME paid legitimate payment bond claims of subcontractors using the misdirected funds.

Citing to accounts payable records of DME, defendant contends that DME used a portion of the misdirected payment to make over $100,000 in payments to various subcontractors. Def.'s Mot. 26–27 (citing Def.'s App. 291–94 (DME Accounts Payable)). Plaintiff contends that "DME never paid any obligations that were the responsibility of Colonial" under the payment bond. PL's Reply 3; *see* Nunziata Reply Aff. ¶ 22 (stating that any "alleged payments by DME" to certain subcontractors and suppliers "were not legitimate payment bond claims on the Project"); Miller Reply Aff. ¶ 22 (same); Stos Reply Aff. ¶ 15 (stating that none of the subcontractors and suppliers allegedly paid by DME "had legitimate bond claims other than the ones that Colonial paid"). Plaintiff further argues that, "despite repeated requests" to DME for proof of such payments, "[n]o evidence of the payment of any legitimate payment bond claim has been produced." Pl.'s Reply 3; *see* Miller Reply Aff. Ex. C (letters from Mr. Miller to counsel for DME) 15–18 (requesting proof of payments).

■ Because there remains a genuine issue of material fact as to whether Colonial has fully performed its obligations under the payment bond, specifically as to whether DME satisfied the alleged time-barred claim of Cumberland and whether DME made payments using the misdirected funds to subcontractors in response to legitimate payment bond claims,[18] summary judgment on this portion of plaintiff s claim is precluded. Without further development of relevant facts and applicable law, the court declines to address defendant's argument that "any right of Colonial to the misdirected payment funds must, as a matter of law, be limited to the actual losses Colonial incurred pursuant to its payment bond, by the amount of such funds DME spent on job costs, and by the amount Colonial recovered in its District Court action." *See* Def.'s Mot. 25; *cf. supra* note 3 (discussing the District Court action).

---

17. Many of the statements in the Reply Affidavits of Wayne Nunziata, Larry Miller and John C. Stos are identical or nearly identical. *Compare* Nunziata Reply Aff., and Miller Reply Aff., with Stos Reply Aff.

18. If, as alleged by defendant, DME used the misdirected funds to satisfy payment bond claims, *see* Def.'s Mot. 26–27, it is unclear whether these payments would affect the discharge of Colonial's obligations under the payment bond or would merely limit the damages Colonial seeks to recover.

**2. The Parties Do Not Dispute that the Government Breached Its Stakeholder Duty**

█ In addition to establishing a right to equitable subrogation under either a performance or payment bond, a surety that seeks to recover funds that have been disbursed by the government to the contractor must also establish that it notified the government of the contractor's default or potential default and that the government breached its stakeholder duty by improperly disbursing the funds. *See Ins. Co. of the West*, 83 Fed.Cl. at 538; *Am. Ins. Co.*, 62 Fed.Cl. at 155. Relying primarily on *Balboa*, plaintiff argues that the Navy violated its duty as an obligated stakeholder by wrongfully delivering $249,743.78 to DME. *See* Pl.'s Mot. 15–16. Plaintiff contends that "[a] stakeholder duty arises when the [government] is given notice by the surety of its equitable rights" and that Colonial provided the Navy with "notice of DME's defaults and [Colonial's] rights" via the stop-payment letter, *Id.* at 14–15. Plaintiff contends that "the Navy was required to hold all funds for Colonial's benefit subsequent to October 20, 2008," the date of the stop-payment letter. *Id.* at 15.

In *Balboa*, the surety received notification that "led it to believe that [the prime contractor] was in financial straits and would not be able to fulfill its payment and performance obligations." *Balboa*, 775 F.2d at 1160. The surety sent a stop-payment letter to the contracting officer "demanding that no further contract funds be released without its consent." *Id.* Nevertheless, the government sent a progress payment to the contractor approximately one week after receiving the stop-payment letter. *Id.* The surety sought recovery for the amount of the progress payment. *Id.* at 1159.

The government argued, in part, that the Court of Federal Claims lacked jurisdiction "over a claim by a surety for non-retained funds, as opposed to those not yet disbursed." *Id.* at 1161 (emphasis omitted). On appeal, the United States Court of Appeals for the Federal Circuit (Federal Circuit) rejected the government's argument, finding "no reasonable basis for the Govern-

ment's distinction between retainages and progress payments when ... the surety informed the Government of the contractor's alleged breach before the payment was disbursed." *Id.* at 1162, The Federal Circuit held that "the United States becomes a stakeholder with a duty of acting with reasoned discretion when a Miller Act surety alleges that the contractor has breached the contract by defaulting under one of [its] bonds," and observed that "[w]hether and under what circumstances the Government chooses to disburse the progress payment in dispute pertains not to the issue of jurisdiction, but rather, to the propriety of the Government's actions." *Id.* With respect to the "propriety of the Government's actions," *id.* the Federal Circuit stated that "when a surety has informed the Government that the contractor is in default, the Government has an obligation to take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job," *id.* at 1164 (internal quotation marks omitted); *see id.* at 1164–65 (identifying eight factors considered "to be important in determining whether the Government has exercised reasonable discretion in distributing funds").

█ Here, Colonial sent the stop-payment letter nearly five months before the Navy disbursed the improper payment to DME. *See* Am. Compl. Ex. B (stop-payment letter) 5–6 (dated October 20, 2008); Def.'s Mot. 8–9 (stating that the misdirected payment was transferred to DME's account on March 20, 2009). The stop-payment letter referenced "allegations of wage issues with regard to employees and non-performance issues" and stated that a claim had been filed against Colonial's payment bond by R & R Plaster. Am. Compl, Ex. B (stop-payment letter) 5 (internal quotation marks omitted). The stop-payment letter therefore expressly notified the Navy of DME's actual or potential defaults under the contract. Moreover, by "request[ing] that no further funds be released under the ... contract without the expressed written consent and direction of Colonial," *id.* at 5–6, the stop-payment letter also notified the government that Colonial was invoking its right to the contract funds, *cf. Am. Ins. Co.*, 62 Fed.Cl. at 155 ("[N]otice that the contractor is in default and that the

surety is invoking its rights to the remaining contract proceeds converts the government into a stakeholder with duties to the surety."). Defendant does not dispute plaintiff's argument and concedes that a surety can "seek to recover from the Government any contract funds that had been disbursed to the contractor after the surety notified the Government of the contractor's defaults." Def.'s Mot. 25, It is uncontested by the parties and is the finding of the court that the notice provided by the stop-payment letter triggered the Navy's stakeholder duty.

■ The court also finds that the government breached its stakeholder duty by sending the final payment of $249,743.78 to DME in violation of the contract modification.[19] It is undisputed that this payment was in error. *See* Aff. of Larry Miller in Supp. of Colonial Sur. Co.'s Mot. for Partial Summ. J., Dkt. No. 45, at Ex. B (Dep. of Joseph W. Yates) 15–17 (referring to the "errant payment," acknowledging that the payment was "sent to the wrong place" and stating that the payment was a "mistake" that was "incorrectly deposited in DME's account"); Def.'s App. 35 (April 23, 2009 e-mail from Mr. Ganter to DFAS) ("Contrary to the Navy & DFAS agreement, Payment # 9 in the amount of

$249,743.78 was transmitted via [electronic funds transfer] to DME's account ... instead of a hardcopy check to the Surety."); Def.'s App. 38 (June 15, 2009 letter from Mr. Ganter to Mr. Chardon) (stating that the payment "had been erroneously transmitted" by DFAS to DME); Def.'s App. 39 (July 29, 2009 letter from Mr. Ganter to Mr. Chardon) (discussing the "erroneous payment"); Def.'s App. 41 (final decision) (stating that DME "erroneously received payment in the amount of $249,743.78" and that this payment was "erroneously transmitted by [DFAS]").

If, with further factual development, plaintiff can establish that equitable rights attached to either Colonial's performance or payments bonds (entitling Colonial to rely on equitable subrogation to bring suit against the government), Colonial may recover improperly disbursed funds from the government based on the theory that the government breached its duty as a stakeholder.

**B. There Are Genuine Issues of Material Fact as to Whether Colonial Can Establish a Contractual Basis for Recovery**

■ It is well established that neither the underlying contract between the government

---

**19.** The court's finding is consistent with this court's conclusion in *Transamerica Premier Insurance Co. v. United States,* 32 Fed.Cl. 308 (1994). There, the surety sent notice to the government that there were unsatisfied claims of subcontractors and materialmen and requested that the government retain the remaining contract funds. *Id.* at 310. At the request of the surety, with the contractor's acquiescence, the government "issued a unilateral contract modification ... changing the mailing address for the remaining contract payments from [the contractor's] office to that of the [surety]." *Id.* at 311. The government sent one progress payment to the surety. pursuant to the contract modification, but sent the final payment to the contractor. *Id.*

The government argued that the mistaken payment alone "[was] not enough to render the Government liable as a stakeholder under the standards enumerated in *Balboa.*" *Id.* at 315. The Court of Federal Claims rejected the government's argument, finding that "it ignore[d] *Balboa*'s crucial emphasis on the difference between 'the Government's role before and after completion of performance on a contract.'" *Id.* (quoting *Balboa,* 775 F.2d at 1164). The Court of Federal Claims explained this difference as follows:

During performance ... the Government's principal interest is in the efficient completion

of the contract. To that end, federal officials are given broad discretion over the administration of the contract.... After performance, however, the Government's interest in retaining funds to ensure contract completion disappears and the contractor's and surety's interests in the retained funds become paramount. Bluntly put, the Government's interest at this point does not extend beyond avoiding liability for sending the retained funds to the wrong party.

*Id.* at 315–16 (internal citations omitted).

The Court of Federal Claims then characterized the government's unilateral contract modification as "the administrative acknowledgement of the Government's duty as a stakeholder of final contract funds." *Id.* at 316. Upon finding that the government "failed to follow its own contract modification, and instead erroneously sen[t] the final contract payment to [the contractor]," the Court of Federal Claims held that the government breached its duty as a stakeholder. *Id.; see also Int'l Fid. Ins. Co. v. United States,* 41 Fed.Cl. 706, 719 (1998) (holding that the government breached its duty as stakeholder when, in violation of a contract modification that required the government to send payments to the contractor and surety as joint payees, the government's "inefficient payment procedures" resulted in a check being sent solely to the contractor).

and the contractor, *ICW*, 243 F.3d at 1370, nor any suretyship agreement between the surety and the contractor, *see Lumbermens*, 654 F.3d at 1311 n.2, gives rise to a contractual relationship between the surety and the government. Consistent with established law, plaintiff relies on neither the underlying contract nor the suretyship agreement as basis for its breach of contract theory of recovery.

Plaintiff argues, instead, that it has privity of contract with the government pursuant to the contract modification and an implied contract that, according to plaintiff, arose out of the September 16, 2008 meeting.[20] *See* Pl.'s Reply 5 (claiming that defendant breached "the express contract of November 3, 2008 and the implied contract of September 16, 2008"); *cf. supra* note 10 (noting that the parties dispute whether the contract modification was entered into on November 3, 2008 or November 4, 2008). Plaintiff contends that the Navy breached these contracts by wrongfully paying DME $249,743.78. *See* Pl.'s Reply 5; Am. Compl. ¶¶ 31–32.

Defendant counters that "there is simply no evidence that Colonial and the [Navy] ever entered into any contract, express or implied." Def.'s Mot. 19. Defendant contends that the contract modification merely modified the existing contract between the Navy and DME—"a contract to which Colonial is not a party and upon which it may not bring suit." *Id.* at 21. And, with respect to

the September 16, 2008 meeting, defendant argues that this meeting did not "evidence the necessary meeting of the minds required of an implied-in-fact contract." *Id.* at 20. Defendant concludes that "no express or implied-in-fact contract exists that would give Colonial privity with the Navy and consequently a right to sue in this [c]ourt." *Id.* at 23.[21]

### 1. The Contract Modification

Plaintiff claims that it had privity of contract with the Navy through the contract modification because both Colonial and the Navy were executing parties to the contract modification. *See* Pl.'s Reply 4; Am. Compl. ¶¶ 7–8. Plaintiff further argues that the Navy breached the contract modification, "which required all payments to be delivered to Colonial[,] by paying the wrong person, DME, $249,743.78 on March 20, 2009." Pl.'s Reply 4; *see* Am. Compl. ¶ 22 ("The Navy, through its authorized representatives and agents, violated its express agreement to pay Colonial for the work that was performed on the Project.").

Defendant counters that "there is no factual or legal basis upon which [the contract modification] formed a new contract between the [Navy] and Colonial, which was a stranger to the original contract." Def.'s Mot. 23. According to defendant, the contract modification "was executed by DME and the Navy, with a signed concurrence by Colonial," *id.* at

---

20. The Amended Complaint refers to the alleged agreement arising out of the September 16, 2008 meeting variously as an implied contract, *see* Am. Compl. ¶¶ 23–24, a verbal agreement, *id.* at 8; *see id.* ¶ 7, and an express contract, *id.* ¶ 31. Other than a reference to "the Navy's demands of September 16, 2008," *see* Pl.'s Mot. 2, plaintiff's Motion discusses only the Navy's alleged breach of the contract modification, *id.* at 17. Plaintiff's Reply refers to "the implied contract of September 16, 2008," Pl.'s Reply 5, and states that "the September 16, 2008 meeting resulted in an agreement as Colonial acceded to Defendant's demands to take over performance of the project by placing a full time [sic] consultant on the site and[ ] by controlling the contract funds," *id.* at 4; *accord* Am. Compl. ¶ 9 ("The express demands of the Navy of September 16, 2008 and Colonial's acceptance of them constituted a contractual takeover of the Project by Colonial as demanded by the Navy."); Nunziata Aff. ¶ 16 (same). The court understands from plaintiffs

filings that plaintiff is alleging that the September 16, 2008 meeting resulted in an implied-in-fact contract.

21. In the Amended Complaint, plaintiff states that "[t]he Navy materially breached its implied duties to act in good faith with Colonial," Am. Compl. ¶ 55, and that the Navy is liable for the damages that resulted from this breach, *id.* ¶ 58. However, plaintiff does not address this contention in its briefing. Defendant argues, simply, that plaintiff's good faith and fair dealing argument must be dismissed because "it lacks a necessary factual predicate—*i.e.*, the formation of a contract." Def.'s Mot. 23–24. Given that the court finds that genuine issues of material fact exist as to whether Colonial can establish a contractual basis for recovery, the court declines to address plaintiff's contention of material breach of the implied duty of good faith and fair dealing at this juncture.

21-22, and the "[s]igned consent of the surety to the contractor's contract modification does not ... bring a surety in as party to the contract," *id.* at 22. Defendant argues, "This is in keeping with the traditional rule that when the Government changes or modifies a contract which is covered by a bond and the change would materially enlarge the liability of the surety, the surety's liability is discharged if the surety's consent has not been obtained." *Id.* (citing *United States v. Freel*, 186 U.S. 309, 22 S.Ct. 875, 46 L.Ed. 1177 (1902)); *see also* Def.'s Reply 3 ("Colonial's consent to a material modification to the payment provision in DME's contract was properly obtained, but only implicates whether Colonial's liability would be discharged if the Government brought suit against Colonial."). Defendant argues that "[c]onsent ... implicates the surety's potential liability,

but does not give the surety a contractual cause of action against the Government." Def.'s Mot. 23.

■■■■ The court finds plaintiff's briefing on this issue unpersuasive. As support for its breach of contract theory of recovery, plaintiff cites to and discusses cases that deal only with equitable subrogation and the government's stakeholder duty. *See* Am. Compl. ¶ 35–36, 38, 40; Pl.'s Mot. 17–22.[22] Plaintiff does not address whether the required elements of a contract exist, *cf. Anderson*, 344 F.3d at 1353 (stating four elements required for a binding government contract), nor does plaintiff address defendant's argument that the "[s]igned consent of the surety to the contractor's contract modification does not ... bring a surety in as party to the contract," *see* Def.'s Mot. 22.

---

22. Plaintiff also appears to raise an impairment of suretyship/*pro tanto* discharge theory of recovery against the government. Plaintiff claims that the government "breached its duty to administer the contract in a manner that did not materially increase the risk that was assumed by Colonial when the contract was bonded." Am. Compl. ¶ 36 (citing *Nat'l Sur. Corp. v. United States* (*National Surety* ), 118 F.3d 1542, 1547 (Fed.Cir. 1997)); *see id.* ¶ 39 (stating that "[t]he Navy's improper payment to DME materially increased Colonial's losses and damages and impaired Colonials suretyship status"); *cf.* Pl.'s Mot. 19–20 (referencing *National Surety* ), This court does not have jurisdiction over impairment of suretyship/*pro tanto* discharge claims of recovery against the government, as explained below.

An impairment of suretyship/*pro tanto* discharge claim has its origins "as a state law *defense* that a surety could assert to avoid enforcement of its bond obligation on the grounds that the obligee ... had taken improper actions which prejudiced the surety by increasing its financial risk." *Lumbermens Mut. Cas. Co. v. United States* (*Lumbermens*), 654 F.3d 1305, 1313 (Fed.Cir.2011). Such improper actions by an obligee include "making early contract payments or overpayments to the principal obligor in a manner inconsistent with specific payment schedules, conditions, or retainage provisions in the bonded contract." *Id.* at 1314, The theory is that, "by wasting the contract funds in contravention of the contract's terms, the obligee may impair the surety's future right of equitable subrogation and increase its risk of loss, thereby discharging it from its bond obligation *pro tanto*," that is, to the extent the surety has been prejudiced. *Id.*

In *Lumbermens*, the Federal Circuit explained that, while impairment of suretyship/*pro tanto* discharge "may be a sound legal theory for re-

covery against an obligee as a matter of state law, ... the United States has not waived sovereign immunity as to such claims." *Id.* at 1315. The Federal Circuit noted, however, "If a surety concludes that the government has improperly impaired its collateral, the surety has a right to withhold payment on the bond, to the extent the surety has been prejudiced, based on the defense of impairment of suretyship/*pro tanto* discharge." *Id.* at 1317.

Plaintiff's reliance on *National Surety, see* Am. Compl. ¶ 36; *see also* Pl.'s Mot. 19, 21, is misplaced. The Federal Circuit in *Lumbermens* stated that "*National Surety* merely found that the notice requirement for an equitable subrogation claim was satisfied where 'the government had knowledge of the default ... and so informed the surety.' " *Lumbermens*, 654 F.3d at 1313 (quoting *National Surety*, 118 F.3d at 1547). The Federal Circuit further stated that *National Surety* was decided based on equitable subrogation and "therefore has no bearing on the issue of whether the government has waived sovereign immunity with respect to claims based on the unapplied theory of impairment of suretyship/*pro tanto* discharge." *Id.* at 1317.

Here, Colonial does not seek discharge from its bonded obligations; rather, Colonial seeks to recover from the government a misdirected payment that, according to plaintiff, "materially increased Colonial's losses and damages and impaired Colonials' suretyship status." Am. Compl. ¶ 39. To the extent that plaintiff attempts to invoke an impairment of suretyship/pro *tanto* discharge theory of recovery, the Federal Circuit has made clear that this court does not have jurisdiction over such claims. *See Lumbermens*, 654 F.3d at 1315 (finding that "the United States has not waived sovereign immunity as to such claims").

Moreover, plaintiff's briefing fails to make clear whether plaintiff s breach of contract claim is based on Colonial's being a party to the contract under the Contract Disputes Act (CDA) of 1978,[23] *compare* 41 U.S.C. § 7103(a)(1) (stating that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision"), *and id.* § 7101(7) (defining a contractor as "a party to a Federal Government contract other than the Federal Government"), *with* Am. Compl. ¶ 27 (stating that Colonial "timely submitted its claim to the Contracting Officer regarding the improper payment"), *and* Pl.'s Reply 4 (referring to Colonial as an "executing part[y] to the November 3, 2008 contract"), or whether plaintiff's breach of contract claim is based on Colonial's being a third-party beneficiary of the contract under the Tucker Act, *cf. D & H Distrib. Co. v. United States (D & H )*, 102 F.3d 542, 546 (Fed.Cir.1996) (finding that, where a government contract was modified to name the contractor and subcontractor as joint payees, the subcontractor "enjoys the status of a third party beneficiary with respect to the payment clause of the modified contract and is therefore entitled to enforce that clause against the government"); *Winter v. Floor-Pro, Inc.*, 570 F.3d 1367, 1372 (Fed.Cir.2009) (noting that "[t]he subcontractor in *D & H* invoked the Court of Federal Claims's jurisdiction under subsection (a)(1) of the Tucker Act, 28 U.S.C. § 1491, not under the CDA").

 Notwithstanding the limitations of plaintiff s briefing, it is clear that the court has before it a contract modification that has been signed by authorized agents of Colonial, DME and the Navy. *Cf. Anderson*, 344 F.3d at 1353 (stating that, in addition to offer, acceptance and consideration, a binding agreement with the government requires proof of "a government representative having actual authority to bind the United States in contract"). In light of the foregoing, the court finds that the parties must now develop the factual record and further explicate whether there is a legal basis for plaintiff s

claim that the Navy breached the contract modification. *Cf. Ins. Co. of the West v. United States*, 55 Fed.Cl. 529, 543 (2003) (denying the parties' motions for summary judgment where, as here, the surety only "obliquely" addressed in its briefing a claim that the government breached a payment provision in a contract modification). Accordingly, summary judgment as to this portion of plaintiff s claim is precluded.

### 2. The September 16, 2008 Meeting

Plaintiff claims that "the September 16, 2008 meeting resulted in an agreement as Colonial acceded to Defendant's demands to take over performance of the project by placing a full time consultant on the site and[ ] by controlling the contract funds." Pl.'s Reply 4. The court understands plaintiff to be arguing that the September 16, 2008 meeting gave rise to an implied-in-fact contract, under which plaintiff would hire a consultant and complete the project by paying the suppliers and subcontractors in order to avoid a default termination of DME. *See id.*; Am. Compl. ¶¶ 4–5, 7; *supra* note 20 (discussing plaintiff's characterization of the September 16, 2008 meeting). Plaintiff argues that the Navy "materially breached this agreement to deliver all future payments to Colonial by wrongfully paying $249,743.78 on March 20, 2009." Pl.'s Reply 5.

Defendant claims that, contrary to plaintiff's assertions, "the Navy did not make demands for the surety to complete the project and place a consultant on site." Def.'s Mot. 20. Defendant also contends that "Colonial cannot now rely upon an implied-in-fact contract arising out of the meeting when contemporaneous documents demonstrate the on-going nature of discussions and the absence of an unambiguous offer, an unambiguous acceptance, the mutual intent of both parties, and consideration." Def.'s Reply 4; *see* Def.'s Mot. 21 (claiming that "[t]he correspondence [following the meeting] demonstrates that there was not a 'meeting of the minds' at the meeting; rather, the parties

---

**23.** Congress recently amended the CDA and enacted the amendment into positive law. *See* Act of Jan. 4, 2011, Pub.L. No. 111–350, 124 Stat. 3677 (the CDA amendment). The CDA amendment relocates the provisions of the CDA from 41 U.S.C. §§ 601–13 (2006) to 41 U.S.C. §§ 7101–09. *See id.* §§ 7101–09.

proposed various solutions in an effort to cooperate").

The parties dispute the events that took place during and following the September 16, 2008 meeting. According to Mr. Miller, "the Navy demanded that Colonial place a full time consultant on the Project to act as project superintendent and to control all of the job funds to avoid a default termination." Miller Reply Aff. ¶ 4. Mr. Miller's account of the meeting is supported by Mr. Nunziata. *See* Nunziata Aff. ¶ 7; Nunziata Reply Aff. ¶ 4. However, Mr. Nunziata was not present at the September 16, 2008 meeting, *see* Def.'s App. 18 (sign-in sheet for the meeting), a circumstance that materially affects the weight to be given to his affidavits, *cf.* Def.'s Mot. 20 n.5 (objecting "to the portions of Mr. Nunziata's affidavit made without personal knowledge"). Both Mr. Miller and Mr. Nunziata claim that Colonial agreed to the Navy's demands and placed a consultant on the project on September 24, 2008. Nunziata Aff. ¶ 10; *see* Miller Reply Aff. ¶ 5 (stating that he retained the consultant on or about September 23, 2008).

According to Ms. McDonald, at no point during the September 16, 2008 meeting did the Navy "demand the surety take over the job or pay all DME's costs to complete [the project]." McDonald Decl. ¶ 9. Rather, Ms. McDonald claims that DME raised the possibility of hiring an on-site consultant, *id.* ¶ 6, and that she merely suggested having "payments ... mailed 'in care of the surety so the surety could ensure [the] subcontractors and suppliers were timely paid," *id.* ¶ 7. Ms. McDonald's account of the meeting is supported by Mr. Ganter. *See* Def.'s App. 331–32 (Dep. of William Ganter) (stating that "no one demanded" that Colonial place a consultant on site and agreeing that the Navy "suggested that Colonial take control of the job funds" but did not "demand" that Colonial do so). Following the meeting, Ms. McDonald drafted an agreement that attempted to memorialize the discussions that occurred at the meeting. McDonald Decl. ¶ 10; *see* Nunziata Aff. Ex. B (draft agreement) 18–19. Ms. McDonald's draft agreement provided that

contract payments would be made in care of Colonial and further provided for the retention of a "Roofing Consultant." *See* Nunziata Aff. Ex. B (draft agreement) 18. Ms. McDonald e-mailed the draft agreement to Mr. Miller on September 18, 2008. *See id.* at 17 (Sept. 18, 2008 e-mail from Ms. McDonald to Mr. Miller referencing the attached draft agreement).

On September 23, 2008, Mr. Miller sent Ms. McDonald a letter stating that Colonial was hiring a consultant "to perform the requested tasks." Nunziata Aff. Ex. C (Sept. 23, 2008 letter from Mr. Miller to Ms. McDonald) 21. Attached to the letter were Mr. Miller's "proposed changes" to the draft agreement. *Id.* at 21–23; *see* McDonald Decl. ¶ 15 (confirming receipt of Mr. Miller's "marked-up copy" of the draft agreement). According to Ms. McDonald, several e-mail communications between Mr. Miller and Ms. McDonald followed. *See* McDonald Decl. ¶¶ 16–18. In an e-mail dated October 3, 2008, Mr. Miller accused the Navy of "[d]emanding that Colonial have a consultant on site," *id.* ¶ 17, to which Ms. McDonald responded, "We are not demanding anything we requested that you put someone on site— you agreed at the meeting ...,"[24] *id.* ¶ 18; *see id.* ("We all met; we discussed how to get this contract on track.... We all agreed that the Surety would assist with provision of a consultant."). In addition, Ms. McDonald stated that she believed Mr. Miller was "purposely trying to obscure the issues," and that she was "now assuming that the surety is NOT willing to assist with the requested consultant services." *Id.* In an October 9, 2008 e-mail to Ms. McDonald, Mr. Miller discussed his view of the draft agreement: "I only indicated that I would review a proposed agreement. Your proposal was unacceptable. I never agreed to any agreement as you well know." Def.'s App. 19 (Oct. 9, 2008 e-mail from Mr. Miller to Ms. McDonald).

On October 16, 2008, Mr. Ganter sent Mr. Nunziata a letter that detailed the events of the September 16, 2008 meeting and the subsequent correspondence between Mr. Mil-

---

**24.** Neither of these e-mails is in the record. The McDonald Declaration includes only quotations from these e-mails. *See* McDonald Decl. ¶¶ 17–18.

ler and Ms. McDonald. Def.'s App. 20–25 (Oct. 16, 2008 letter). According to the October 16, 2008 letter, Mr. Ganter believed that the parties present at the September 16, 2008 meeting had agreed that the following would occur:

> The Navy would draft up a tri-partite agreement between DME, the surety and the Navy which would memorialize the agreement that a third party roof consultant would be provided by the surety, at their cost, to oversee the work. In addition, the Navy suggested that the surety agree to receive payment for DME—i.e. payments would still be made to DME but they would be sent in care of Colonial and be mailed to the Surety's address. Although Mr. Miller initially indicated that such a procedure was not necessary, he agreed to discuss this matter again with Ms. McDonald as the parties developed a draft agreement.

*Id.* at 21. The October 16, 2008 letter also stated that it was the Navy's "understanding that any final agreement would ultimately become a modification to the contract." *Id.* Mr. Ganter stressed that "no demand was made by the Navy; rather the parties agreed that this was the way to help DME get the job done on time and in compliance with the contract terms." *Id.* Mr. Ganter requested advice from Mr. Nunziata as to whether he wished "to pursue the proposed modification agreement in a form satisfactory to both parties or end any further discussions of this matter." *Id.* at 25.

The contract modification was signed on November 4, 2008. Am. Compl. Ex. C (contract modification) 11–12. It is not clear how the parties came to agree on the language of the contract modification, which contains no reference to the "Roofing Consultant" that appeared in the draft agreement. *Compare id. with* Nunziata Aff. Ex. B (draft agreement) 18.

The record developed in support of the parties' motions for summary judgment is not dispositive as to whether or not an implied-in-fact agreement arose out of the September 16, 2008 meeting. The parties must further develop the factual record to resolve whether, as plaintiff claims, the Navy breached an implied-in-fact agreement.[25] Summary judgment as to this portion of plaintiff s claim is therefore precluded.

IV. Conclusion

Given the foregoing, plaintiff's Motion is DENIED, and defendant's Motion is DENIED. Pursuant to the court's Order of July 9, 2012, Dkt. No. 44, the court will hold a telephonic scheduling conference with the parties on Thursday, January 24, 2013 at 10:00 a.m. Eastern Standard Time (EST). The parties shall, at or before 5:00 p.m. EST on Wednesday, January 23, 2013 file a joint status report—or if the parties do not agree, separate status reports—addressing whether, further to the Order of July 9, 2012, "[t]rial shall be held from Tuesday, May 14, 2013 through Thursday May 16, 2013," *id.* or whether other proceedings can earlier address the evidentiary issues identified in this Opinion.

IT IS SO ORDERED.

---

**25.** If plaintiff establishes that it was in privity of contract with the Navy through the contract modification, *see supra* Part III.B.1, the parties must also address whether the alleged implied-in-fact contract covers the same subject matter as the contract modification, *see Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1326 (Fed. Cir.1997) ("[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter."); *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed.Cir.1990) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract.").